FILED

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

2012 OCT 26  P 3: 56

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| SCHNADER HARRISON SEGAL<br>& LEWIS LLP,<br><br>    Plaintiff,<br><br>        v.<br><br>LOREN W. HERSHEY,<br><br>    Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil No. 1:12-cv-00928-AJT/IDD |

## DEFENDANT'S ANSWER AND COUNTERCLAIMS

Defendant Loren W. Hershey ("Defendant" or "Mr. Hershey" or "Counter-Plaintiff") hereby files his Answer to the Complaint (the "Complaint") filed herein by the Plaintiff and also files certain Counterclaims against Plaintiff Schnader Harrison Segal & Lewis LLP ("Schnader" or "Plaintiff" or "Counter-Defendant").

## ANSWER

With respect to each numbered paragraphs of the Complaint, Defendant states as follows:

1.      Hershey is a practicing attorney and a resident of the Commonwealth of Virginia. The Schnader law firm is a Pennsylvania Limited Liability Partnership with offices in Pennsylvania, New York, New Jersey, Delaware, California, and the District of Columbia. Schnader does not have an office in the Commonwealth of Virginia and none of Schnader's partners is a citizen of the Commonwealth of Virginia. This Court has diversity jurisdiction over Schnader's claims under 28 U.S.C. §1332.

**ANSWER:**  With respect to the first sentence of paragraph 1 Defendant admits

that he is a resident of Virginia and admits in part and denies in part he is a practicing

attorney; Defendant admits that he is licensed to practice law in the District of Columbia and in Ohio. With respect to the second sentence of paragraph 1 Defendant lacks sufficient information to admit or deny the averments. With respect to the third sentence of paragraph 1 Defendant lacks sufficient information to admit or deny the averments. With respect to the fourth sentence of paragraph 1 the Defendant lacks sufficient information to admit or deny that diversity jurisdiction under 28 U.S.C. §1332.

2.     On December 14, 2011, Hershey engaged Schnader to represent certain of his interests in a complex multi-jurisdictional matter involving lawsuits pending in the United States Bankruptcy Court for the Eastern District of Virginia, Alexandria Division (*In re: Acadia Investments, L.C.,* Case No. 11-12591) and the New York County Supreme Court (*BMO Harris Bank, N.A. v. DLJ Private Equity Partners Fund II, L.P.,* Index No. 112067/11). Hershey retained Schnader to oppose a $15,000,000.00 garnishment petition in New York and to protect his interests in a bankruptcy proceeding in Virginia involving an investment firm of which Hershey was a managing member.

**ANSWER:** Paragraph 2 contains characterizations of the Hershey engagement of the Defendant and a description of the scope and engagement which Defendant characterizes as inaccurate and incomplete. The Defendant admits that a certain engagement letter was executed by him on or about December 14, 2011 and admits nothing further.

3.     Schnader and Hershey signed an engagement letter that described the scope of the agreed-upon representation and set forth Schnader's billing rates, monthly invoice and payment process, payment for disbursements, and retainer requirement (appended hereto as Attachment A). The engagement letter also provided that Hershey would pay Schnader's invoices for services in December 2011 and January 2012 by February 29, 2012, and on a quarterly basis thereafter. The engagement letter stated that Hershey's obligation to pay Schnader's fees was not contingent on outcomes. Upon execution of the engagement letter, Hershey paid Schnader a retainer of $25,000.00.

**ANSWER:** Paragraph 3 contains characterizations of a certain engagement letter that are inaccurate and incomplete. The Defendant admits that he paid $25,000 to the Plaintiff on a date uncertain in December 2011.

4.      Despite Hershey's failure, prior to engaging Schnader, to timely respond to a garnishment order in the New York lawsuit, Schnader successfully stayed the execution of the order for the first $1,500,000.00 garnishment and engaged in settlement negotiations with the creditor and the bankruptcy trustee that looked promising to achieving a favorable resolution for Hershey of these complicated matters.

**ANSWER:**  Paragraph 4 contains characterizations that are inaccurate and incomplete. The Defendant neither admits nor denies any and all of the averments of paragraph 4.

5.      Schnader gave Hershey draft invoices reflecting the work Schnader performed in December 2011 and January 2012 before releasing them as final invoices so that Hershey had an opportunity to express any dissatisfaction with the description of the work, the quality of the work, or the amount of time devoted to the representation.  Hershey did not.

**ANSWER:**  Paragraph 5 contains characterizations that are inaccurate and incomplete. The Defendant neither admits nor denies any or all of the averments contained therein.

6.      Hershey repeatedly expressed, both orally and in writing, that he was pleased with the high-quality work Schnader provided.

**ANSWER:**  Paragraph 6 contains characterizations that are inaccurate and incomplete. The Defendant neither admits nor denies any and all of the averments of paragraph 6.

7.      Schnader submitted invoices dated (a) January 30, 2012, for the firm's work in December 2011 in the amount of $78,484.62 and (b) February 13, 2012, for the firm's work in January 2012 in the amount of $127,381.71.  The total amount billed by Schnader as of February 29, 2012, was $205,866.33.  Pursuant to the agreement between Schnader and Hershey, Schnader applied the $25,000.00 retainer, leaving a balance of $180,866.33.

**ANSWER:**  With respect to the first sentence of paragraph 7, the Defendant denies receiving an invoice dated January 30, 2012.  With respect to the second sentence of paragraph 7, the Defendant denies that an Agreement existed between Plaintiff and Defendant that any monies were a "balance owing."

8.     Although Hershey stated that the invoices fairly represented the work performed, he did not make any payment.

**ANSWER:**  Hershey denies any and all of the averments of paragraph 8.

9.     Based on Hershey's assurances that he would pay the outstanding balance and future invoices, Schnader continued to represent Hershey in the two lawsuits.

**ANSWER:**  Paragraph 9 contains characterizations that are inaccurate and incomplete.  The Defendant denies any and all of the averments of paragraph 9.

10.     Schnader submitted additional invoices to Hershey dated March 13, April 18, and July 26, 2012, in the amounts of $31,406.68, $36,415.36, and $12,025.00, respectively, covering services provided from February 1 through April 10, 2012.  When added to the previous outstanding balance of $180,866.33, Hershey's invoice, not including interest, totaled $260,713.37.

**ANSWER:**  With respect to the first sentence of paragraph 10 Defendant denies each averment contained therein.  With respect to the second sentence of paragraph 10 the Defendant denies each averment contained therein.

11.     Despite his assurances, Hershey did not make any payments.

**ANSWER:**  Paragraph 11 contains characterizations that are inaccurate and incomplete.  The Defendant neither admits nor denies the averments contained therein.

12.     Because Hershey disregarded Schnader's sound legal advice and, despite the obligation to do so set out in the Engagement Letter, refused to make any payments, Schnader petitioned the Virginia and New York Courts on April 10, 2012 and May 2, 2012, respectively, for leave to withdraw as Hershey's counsel in these cases.  Both Courts approved Schnader's withdrawal as counsel.

**ANSWER:**  The first sentence of paragraph 12 contains characterizations that are inaccurate and incomplete and otherwise Defendant admits that Plaintiff filed Motions to withdraw its appearance in certain judicial proceedings.  With respect to the second sentence of paragraph 12 the Defendant admits that the Plaintiff ceased to continue as his counsel in the referenced civil proceedings.

13.     Schnader repeatedly offered to meet with Hershey to discuss the outstanding amount, but he has consistently ignored Schnader's requests.

**ANSWER:** The characterizations of paragraph 13 are inaccurate and incomplete.

Notwithstanding, Defendant denies the averments contained therein.

14.     In light of the complexity, history, and urgent status of both the New York and Virginia cases at the time Hershey first engaged Schnader, the fees charged and costs incurred by Schnader are fair and reasonable.

**ANSWER:** Paragraph 14 contains characterizations that are inaccurate and

incomplete. Notwithstanding, the Defendant denies that any and all fees sought to be

charged and cost to be incurred, as averred by the Plaintiff are fair and reasonable.

## COUNT I

## BREACH OF CONTRACT

15.     Schnader incorporates by reference paragraphs one – 14.

**ANSWER:** Defendant restates each response in paragraphs 1 through 14 above as

if fully set forth herein.

16.     Schnader entered into a contract with Hershey for legal representation.

**ANSWER:** Paragraph 16 contains averments that are inaccurate and incomplete.

Notwithstanding, the Defendant denies any and all of the averments herein.

17.     As required by that contract, Schnader performed reasonable and necessary legal services for Hershey as part of its representation.

**ANSWER:** Paragraph 17 contains averments that are inaccurate and incomplete.

Notwithstanding, the Defendant denies any and all of the averments therein.

18.     Hershey has a contractual duty to pay for the legal services provided by Schnader.

**ANSWER:** The Defendant denies that he has any contractual duty to pay for any

alleged "legal services provided by Schnader."

19.     Despite agreeing to quarterly payments of invoices, Hershey failed, except for the initial retainer fee, to pay Schnader the legal fees owed to Schnader under the contract.

**ANSWER:** The Defendant denies any obligations to pay any payments to Plaintiff

under the alleged contract or otherwise.

20.     As a result of Hershey's failure to pay, Schnader has suffered damages. These damages included unpaid principal in the amount of $260,713.37, plus interest, attorneys' fees, and costs.

**ANSWER:** With respect to the first sentence of paragraph 20 Plaintiff has denied

that Defendant has suffered damages.  As to the second sentence of paragraph 20

Defendant denies each averment contained therein.

## COUNT II

### QUANTUM MERUIT

21.     Schnader incorporates by reference paragraphs one – 20.

**ANSWER:** Defendant restates each response in paragraph 1 through 20 above as if

fully set forth herein.

22.     Through its legal representation of Hershey in litigation, Schnader has conferred a benefit on Hershey.

**ANSWER:** Paragraph 22 contains characterizations that are inaccurate and

incomplete.  Notwithstanding, Defendant denies that Plaintiff conferred any benefit

whatsoever on Defendant.

23.     Hershey is fully aware of the benefit provided by Schnader's legal services.

**ANSWER:** Denied.

24.     Hershey retained the benefit conferred by Schnader's work on his behalf.

**ANSWER:** Denied.

25.    The circumstances of Hershey's acceptance of the benefit conferred on Schnader, in the amount of $260,713.37, make it inequitable for Hershey to retain that benefit without the payment of its value.

**ANSWER:** Denied.

26.    Defendant denies any and all allegations made in the Complaint not specifically admitted herein with respect to the Prayer for Relief following paragraph 25. Defendant denies that Plaintiff is entitled to its requested relief.

**[NOTHING MORE IS INTENDED ON THIS PAGE]**

## LOREN W. HERSHEY COUNTERCLAIMS AGAINST
## SCHNADER HARRISON SEGAL & LEWIS, LLP

### PARTIES, JURISDICTION AND VENUE

1.       Loren W. Hershey, a resident of Fairfax County, Virginia brings these

multiple claims against Schnader Harrison Segal & Lewis LLP a law firm entity with no

domicile or business presence in Virginia.  This Court has diversity jurisdiction over these

claims under 28 U.S.C. §1332 and venue is proper in the Eastern District of Virginia.

### FACTS

2.       On or about December 6, 2011 Loren W. Hershey, Esq. ("Mr. Hershey" or

"Counter-Plaintiff") placed a telephone call to John B. Britton ("Mr. Britton"), Partner-in-

Charge of the Washington, D.C. office of Schnader Harrison Segal & Lewis LLP

("Schnader" or "Counter-Defendant").

3.       Mr. Hershey requested an opportunity to discuss pending business and

litigation matters pertaining to Acadia Investments L.C. ("Acadia") a family investment

company, organized under the limited liability company laws of Virginia, Mr. Hershey

previously served as Managing Member and BMO Harris Bank, N.A. ("Harris Bank"), the

counterparty with which Mr. Hershey and Acadia were engaged in various phases of

litigation.

4.       Mr. Hershey in the same telephone conversation explained to Mr. Britton

that he sought a new comprehensive legal services relationship with a full service law firm

for his interests initially and, prospectively, for the interests of his family, including legal

counsel with extensive experience in support of Acadia's $50 million portfolio of private

equity holdings and Mr. Hershey's $4.5 million of private equity holdings.  Mr. Hershey

8

also explained that he would seek legal services respecting certain estate and trust planning matters as part of a broader engagement.

5.     Mr. Hershey explained in the same telephone conversation to Mr. Britton that he sought to provide substantial financial support for a Plan of Reorganization being formulated in a Chapter 11 proceeding in which Acadia as Debtor-in-Possession was seeking an early exit pursuant to a recently-entered order of the Bankruptcy Court Judge. (see Appendix A hereto). (Case No. 11-1259 pending in the United States Bankruptcy Court for the Eastern District of Virginia, Alexandria Division referred to herein as the "Virginia Proceeding").

6.     Mr. Hershey arranged to visit with Mr. Britton at the Washington, D.C. office of Schnader on or about Wednesday, December 7. At the meeting which occurred in a conference room of Schnader's Washington, D.C. offices, Mr. Hershey explained his goals in seeking to retain Schnader pursuant to be negotiated engagement letter and presented Mr. Britton with Acadia company data including its Operating Agreement (dated February 1, 2002), a 4-page pro forma balance sheet and 2-year statement of revenues and a comprehensive list of the Company's investment assets as well as a copy of his personal financial statement.

7.     On the next day, Thursday, December 8 at 3:11 p.m., Mr. Britton initiated an unsolicited email to Mr. Hershey regarding a certain filing made in the Supreme Court of the State of New York, New York County in a matter styled *BMO Harris, N.A. v. DLJ Private Equity Partners Fund II, L.P.*, Index No. 112067/2011 (the "New York Proceeding"), a "turn-over action" by Harris Bank against a total today of $1.95 million of Mr. Hershey's assets, being withheld by the Credit Suisse administered Fund.

8.    Upon receiving Mr. Britton's unsolicited email Mr. Hershey telephoned Mr. Britton and requested that he not use emails as a form of communication in any future communications between and among Schnader, its partners and Mr. Hershey. In the same telephone conversation, Mr. Britton invited Mr. Hershey to return to his offices on Friday, December 9 where Mr. Britton proposed to outline a possible scope of engagement by Schnader to represent Mr. Hershey and his family's equity interests in Acadia in a comprehensive fashion.

9.    On or about Friday, December 9, 2011, Mr. Hershey met with Mr. Britton in Schnader's Washington, D.C. office conference room. Mr. Britton presented to Mr. Hershey a draft of an engagement letter significantly different than the engagement letter ultimately executed on or about December 14, 2011.

10.    Mr. Britton provided Mr. Hershey with biographical data on six of his partners located in the Philadelphia offices of Schnader suggesting that one or more of these attorneys had the requisite legal expertise in the type of private equity investments which comprised Acadia's and Mr. Hershey's portfolio and who could serve as "primary" or "lead" counsel to the broad engagement Mr. Hershey had explicitly and expressly set forth as his immediate and longer term goals.

11.    Mr. Hershey and Mr. Britton agreed to meet again on or about Monday, December 12 at Schnader's Washington, D.C. offices. Mr. Hershey, at this next meeting, received from Mr. Britton an engagement proposal, "troubleshooting in nature," to address the then pending "litigation opportunities" which he and a partner in Pittsburgh identified as Eric T. Smith, Esq. who specialized in bankruptcy practice, had discussed to collaborate on in the proposed scope of representation since Mr. Hershey's Friday meeting with

Mr. Britton. At the Monday meeting, Mr. Britton proposed to prepare an alternative form of engagement letter which he would send over later in the day for Mr. Hershey's review and comment. Mr. Hershey requested that Schnader be prepared immediately to file a Claim in the Virginia Proceeding seeking $4.3 million owed to him by Acadia.

12.     Upon receiving by telecopier Mr. Britton's second proposed engagement letter, Mr. Hershey requested the opportunity to hold a three-way telephone conversation with Mr. Smith. This conversation lasted for approximately 45 minutes during which Mr. Smith spoke about his specialized knowledge of the aviation industry and his expertise in bankruptcy while expressing his complete unfamiliarity with private equity investments or issues related to asset/wealth management. Mr. Smith touted his expertise in litigating bankruptcy matters against McGuire Woods LLP when on the opposite side from his client interest in another, unrelated case. In this telephone conversation, Mr. Britton and Mr. Smith explained to Mr. Hershey the "litigation strategy" they had devised and then vigorously recommended that Mr. Hershey adopt and pursue their strategy respecting the New York Proceeding and the Virginia Proceeding. Mr. Hershey re-explained to Mr. Britton and Mr. Smith that Harris Bank and Acadia were obligated by a Bankruptcy Court Order entered on November 28, 2011 to reach a negotiated settlement with Harris Bank on or about January 20, 2012 (see Appendix A hereto). Mr. Hershey reiterated to Mr. Smith the immediate need to file a $4.3 million claim in the Virginia Proceeding.

13.     On or about Wednesday, December 14, Mr. Hershey met with Mr. Britton at Schnader's Washington, D.C. office to review components of the proposed engagement letter. Mr. Hershey expressed reservations about the defined elements within the scope of engagement and the "litigation strategy" devised by Schnader's partners. Mr. Hershey expressed his desire to enter into immediate and direct negotiations with Harris Bank

through its attorneys and to have a letter written on Schnader's letterhead equivalent to one written by a Chicago law firm dated August 25, 2011 provided to Schnader. Mr. Hershey explained that liquidity to fund a "litigation strategy" on a going forward basis would be a significant issue unless and until the Virginia Proceeding was drawn to a close promptly as was both his and his family's express desire and goal and was consonant with public utterances by Harris Bank and Acadia legal representatives in the Virginia Proceeding in open court on August 16, 2011 and, further, was consonant with the Order entered by Bankruptcy Judge Robert G. Mayer on November 28, 2011 (see Appendix A hereto).

14.     Mr. Britton assured Mr. Hershey that his firm could and would achieve his goals and the goals of the Acadia equity holders and that this "litigation strategy" was the best way to proceed. Mr. Britton further explained to Mr. Hershey that as Partner-in-Charge he would retain complete discretion to allow payments of any billings to be made on any schedule otherwise satisfactory to Mr. Hershey but as a matter of firm practice Mr. Britton desired to indicate "quarterly payment targets." This was a substantive consideration to which Mr. Hershey reluctantly agreed explaining that the "sought-to-be-garnished funds" would be the ultimate source for funding legal expenses and that he projected this to be over a 12-18 month period.

15.     Following the execution of the December 14 engagement letter, Mr. Hershey was invited by Mr. Britton to communicate directly with Benjamin P. Deutsch, Esq., a partner of Schnader in the New York office ("Mr. Deutsch") while he, Mr. Britton, was present in the conference room. Mr. Deutsch stated that would seek to file papers in the New York court allowing Mr. Hershey to intervene in the then pending New York Proceeding. Mr. Hershey in the initial telephone conversation with Mr. Deutsch on Wednesday, December 14 offered to take a train to New York City on Thursday, December

15 to meet and discuss the "litigation strategy" and various options.  Mr. Hershey re-stated

that his goal was to negotiate through intermediaries with Harris Bank and with the Bank's

legal representatives as well as the legal representatives of Acadia to permit three-quarters,

or 75%, of the monies subject to the New York turnover action to Harris Bank to be

applied to the negotiated Bankruptcy Plan of Reorganization on a voluntary basis subject to

a written agreement.  Mr. Deutsch informed Mr. Hershey that he, Mr. Deutsch, would not

negotiate directly with Harris Bank or with Acadia but rather that Mr. Smith and a partner

in Philadelphia, Richard A. Barkasy, Esq. would plan to conduct such negotiations.

Mr. Britton actively discouraged and blocked Mr. Hershey from traveling to New York

City by the Acela train the very next day to meet Mr. Deutsch despite Mr. Hershey's desire

and insistence on doing so.

     16.    With these written and spoken understandings in place, Mr. Britton

indicated that he would "step aside" from responsibility for supervising the matters

proposed and allow Mr. Smith, Mr. Barkasy and Mr. Deutsch to share the lead and that a

to-be-identified partner specializing in private equity investments would immediately be

identified to be assigned to the matter to assist in the legal strategy.  In truth and in fact no

such Schnader partner was ever identified and assigned to the matter.  In truth and in fact at

no time did Mr. Hershey speak with a Schnader partner knowledgeable in private equity

investments at any time.

     17.    On Thursday, December 15 and on Friday, December 16, Mr. Hershey was

presented with drafts of pleadings being prepared under the supervision of Mr. Barkasy and

Mr. Deutsch for his review and comment.  Mr. Deutsch requested that Mr. Hershey execute

an affidavit to be prepared by his colleague in New York, an attorney identified as Thomas

F. Giordano, Esq..  Mr. Hershey proceeded to Schnader's Washington, D.C. office on

Friday afternoon at 2:45 p.m. to review and approve the affidavit and all pleadings to be submitted to the court in New York and the Bankruptcy Court for the Eastern District of Virginia.  With Mr. Britton present in the conference room, Mr. Hershey recited in detail by speaker phone or handset to Mr. Giordano all aspects of his medical condition as then known to and understood by him as had been recently preliminarily diagnosed, known as Chronic Sleep Deficit or Chronic Sleep Deprivation, and all of the negative cognitive effects to which he was then subject and Mr. Hershey further described the expected protracted remediation over a six to twelve month period per his doctor's advice said recovery having begun in early November 2011.  Thereupon, in a subsequent telephone conversation with Mr. Barkasy, Mr. Hershey instructed that a certain Order entered by the Bankruptcy Court be challenged before the running of the appeal period.  Despite urging by Mr. Hershey on Friday, December 16 and Monday, December 19, neither Mr. Smith nor Mr. Barkasy prepared pleadings to challenge the Order (see Appendix B hereto).

18.    At all times from the initial consultation with Mr. Britton on December 6, 2011 to the time of the filing of the certain pleadings referenced in paragraph 16 above, Mr. Hershey instructed Mr. Britton, Mr. Smith, Mr. Deutsch and Mr. Barkasy to initiate on the letterhead of the Schnader law firm a comprehensive written proposal to accomplish the business and economic goals for himself and his family members as equity holders in Acadia as Mr. Hershey had explicitly set forth in his multiple consultations with these identified partners of Schnader.

19.    At all times from the initial meeting with Mr. Britton on December 8, 2011, Mr. Hershey stated this goal to file formal Limited Objections to – or otherwise appeal – certain Debtor and counter-party stipulations providing for tens and hundreds of thousands of dollars of set-offs for which no substantiation existed in the court record of the Virginia

Proceeding. (see Appendix B hereto)   Similarly, Mr. Hershey instructed Mr. Smith and

Mr. Barkasy to file a Limited Objection to a proposed Motion and Order, seeking to get

substantiation of amounts subject to set-offs (see Appendix C hereto).   Neither Mr. Smith

nor Mr. Barkasy prepared or filed such Limited Objection.

   20. At no time from the initial consultation with Mr. Britton on December 6, 2011

to the announced intentions of Schnader to withdraw from representing Mr. Hershey in early

April 2012 did Schnader comply with Mr. Hershey's instruction as stated in paragraph 18 or

otherwise conduct any or all of any negotiations pursuant to written positions of Mr. Hershey

presented on a Schnader letterhead with either the legal representatives of Acadia or with the

legal representatives of Harris Bank.

   21. On or about January 3, 2012 Mr. Hershey travelled to the Philadelphia law

offices of Schnader and conducted a 4-hour meeting with Mr. Barkasy and Mr. Smith

beginning at 11:30 a.m.  As a consequence of the meeting Mr. Hershey instructed

Mr. Smith and Mr. Barkasy to prepare a written letter addressed to Bradford F. Englander,

Esq. ("Mr. Englander") of Whiteford Taylor & Preston, LLP, representing Acadia as the

Debtor in the Virginia Bankruptcy Proceeding, and to Bruce W. Henry, Esq.,

("Mr. Henry") Designated Representative of Acadia as Debtor, Co-Manager of Acadia and

Managing Member of ACRO Management LLC (a single member limited liability

company under contract to Acadia) and in said letter to present Mr. Hershey's business

goals of providing substantial financial support to the then-being-negotiated Acadia Plan of

Reorganization.  Mr. Hershey also reiterated his instruction that a $4.3 million claim be

filed in the Virginia Proceeding.

   22. From the time of the January 3, 2012 consultation with Mr. Smith and

Mr. Barkasy to the time that Schnader announced its intention to withdraw from representing Mr. Hershey in early April 2012 neither Mr. Smith nor Mr. Barkasy complied with Mr. Hershey's instructions: (1) to conduct any or all of any negotiations pursuant to written positions of Mr. Hershey presented on the Schnader letterhead; and (2) to file a $4.3 million claim against the Debtor in the Virginia Proceeding.

23.     At the January 3 meeting with Mr. Smith and Mr. Barkasy, Mr. Hershey instructed that Schnader make a formal written request of Acadia to get access to the company's books and records either by a statutory request under the Virginia Limited Liability Company Act at §13.1-1028(B) or by formal request to Acadia pursuant to Bankruptcy Judge Robert G. Mayer's Order docketed on December 1, 2011 providing for Procedures for Sharing Information (see Appendix D hereto) or by way of requesting by Motion a Rule 2004 Examination under the Federal Rules of Bankruptcy Procedure.

24.     Mr. Smith and Mr. Barkasy informed Mr. Hershey on or about January 11, 2012 that they had scheduled a meeting with Mr. Englander and Mr. Henry to be conducted at the offices of the law firm of Whiteford Taylor & Preston, LLC in Falls Church, Virginia on Wednesday, January 18, 2012 at 1:30 p.m. to discuss terms of settlement. Once again, Mr. Hershey instructed both Mr. Smith and Mr. Barkasy to prepare a written proposal on the Schnader letterhead well in advance of said planned meeting and to prepare and file a $4.3 million claim against the Debtor. Mr. Smith and Mr. Barkasy promised to do so, but failed to do so. Thereupon, on the day of the meeting, Mr. Hershey rapidly prepared a written instruction letter addressed to Schnader counsel dated January 18, 2012.

25.     Before and after the meeting of January 18, 2012 Mr. Hershey requested of Mr. Smith and/or Mr. Barkasy a detailed written memorandum of the meeting, which Mr. Smith and Mr. Barkasy declined and refused to provide to him.

26.     Mr. Smith sought to elicit from Mr. Hershey certain "defined terms of settlement" in a bullet point format to be subsequently presented to Mr. Englander and to Mr. Henry.  Mr. Smith prepared a draft based upon a telephone conference call for review by Mr. Hershey who pointed out the extensive insufficiencies of the "Non-Binding Term Sheet For Plan of Reorganization." ("Term Sheet")  Notwithstanding, Mr. Smith insisted on the need to immediately provide the "Term Sheet" to the Debtor's representatives, a demand to which Mr. Hershey acquiesced on or before Friday, January 20, 2012.

27.     On or about January 24, 2012, Mr. Smith once again insisted that Mr. Hershey agree to certain additional proposed terms to insert into the revised "Term Sheet" in order to allow Harris Bank an opportunity to agree to a certain and concrete compromise settlement on or before January 25, 2012, the date of the argument on the Motion to Intervene before Judge Paul G. Feinman of the Supreme Court, County of New York, said modifications and additions demanded by Mr. Smith to be both urgent and mutually beneficial to Acadia, the Hershey Family equity holder interests and to Mr. Hershey.

28.     Mr. Hershey visited the New York City office of Schnader to meet with Mr. Deutsch and Mr. Giordano.  This meeting occurred on Thursday, January 26, 2012 beginning at approximately 5:15 p.m. and proceeded for approximately two hours.  At this meeting Mr. Hershey was informed by Mr. Deutsch that he, Mr. Deutsch, could not play any role in negotiating any form of settlement with Harris Bank on any of the matters at issue in the New York Proceeding then pending before Justice Paul G. Feinman.

29.     On Friday, January 27, 2012, Mr. Hershey communicated by telephone with Mr. Smith and Mr. Barkasy and instructed them to prepare a draft Settlement Agreement to handle all issues between and among Mr. Hershey, Harris Bank and Acadia as the

Debtor-in-Possession as reflected in the Summary Term Sheet.  Mr. Smith and Mr. Barkasy repeatedly refused to prepare any settlement papers to be transmitted under the Schnader law firm letterhead.

30.     Despite Mr. Hershey's continued request of Mr. Smith, of Mr. Barkasy and, occasionally, of Mr. Britton, the Schnader partners responsible for managing and supervising Mr. Hershey's well-articulated business and economic goals refused to prepare any form of written settlement papers to be transmitted to either Mr. Englander, to Douglas M. Foley, Esq. ("Mr. Foley") of McGuire Woods LLP (representing the interests of Harris Bank in the Virginia Proceedings) or David T.B. Audley, Esq. and Leo V. Gagion, Esq. of Chapman Cutler LLP -- both representing Harris Bank.  Upon information and belief from January 27, 2012 until March 9, 2012, no partner, or other attorney, of Schnader communicated to Mr. Hershey any of the drafts of any of the provisions of an apparently secretly-prepared set of a written settlement paper proposal.  (see Appendix E hereto).

31.     On March 9, 2012 without any forewarning to Mr. Hershey, Mr. Britton transmitted by telecopier the not-previously-reviewed draft of a document entitled "Plan Support and Settlement Agreement" (not otherwise dated) (see Appendix E hereto). Thereupon, Mr. Britton insisted that Mr. Hershey either agree to the draft as presented or make recommendations for requested changes.  Mr. Hershey insisted to Mr. Britton, Mr. Smith and Mr. Barkasy that a roundtable discussion of the Co-Managers of Acadia and respective counsel be conducted prior to formulating changes in the draft "Plan Support and Settlement Agreement."

32.     Mr. Hershey drafted and sent a letter to the Acadia Co-Managers dated March 9, 2012 (attached as Appendix F hereto).  Mr. Hershey also drafted and sent letters dated to the Co-Managers March 13, 27, 29 and a memorandum dated March 30, 3012 in

order to engender a meaningful dialogue between and among the Acadia equity holders, the

Debtor Designated Representative Mr. Bruce W. Henry and Harris Bank through its

representatives.

33.     Schnader steadfastly refused to assist Mr. Hershey in arranging these

communications and/or meetings at all times from December 6, 2011 until it filed its

Motions to Withdraw its representation in the Virginia Proceeding and in the New York

Proceeding on or about April 4, 2012 and on or about April 11-12, 2012, respectively.

34.     At all times from December 6, 2011 including the meeting on January 3, 2012

until the Schnader motions to withdraw from representation Mr. Hershey's interest neither

Mr. Smith nor Mr. Barkasy complied with Mr. Hershey's instructions as referenced in

paragraphs 4, 5, 13, 15, 16, 17, 18, 19, 20, 21, 22, 22, 24, 25, and 28.

## COUNT I

## BREACH OF FIDUCIARY DUTY – UNDER DISTRICT OF COLUMBIA LAW

35.     The Counter-Plaintiff hereby restates paragraphs 1-34 of this Complaint as

if fully set forth herein.

36.     At all times from the first consultation Mr. Hershey initiated with

Mr. Britton on or about December 6, 2011, Schnader and its partners (the "Schnader

partners" or "Schnader") elicited from Mr. Hershey certain confidences and instructions.

In doing so, the Schnader partners sought to engender the services relationship based upon

good faith and trust as recognized under common law between principal and agent and

under the standards of the Code of Professional Responsibility of the District of Columbia

Bar.  In so doing, the Schnader partners through their written agreement, oral and written

inducements and other promises provided assurances to Mr. Hershey that the law firm

could faithfully accomplish his stated business and economic goals.

37.     Through its numerous actions and its through its numerous failures to act in the best interests of Mr. Hershey and his family's equity holding interests in Acadia, over an extended period of time including its threat to withdraw it services and then its actual withdrawal of its services in precipitous fashion, Schnader willfully and intentionally violated its fiduciary duties and caused Mr. Hershey serious and compensable economic injury and economic losses for violation of the law of the District of Columbia.

38.     Mr. Hershey's economic injuries and losses from Schnader's continuous and multiple breaches of fiduciary duty caused by Schnader's willful and intentional conduct through its partners have caused Mr. Hershey losses of not less than $4,300,000 and, in addition, losses of $1,950,000 in monies subject to the "turn-over proceeding" designed to be applied to a Plan of Reorganization and such further economic loss to his equity position in Acadia yet to be quantified.

## COUNT II

## FRAUDULENT INDUCEMENT TO ENTER INTO CONTRACTUAL RELATIONS – UNDER DISTRICT OF COLUMBIA LAW

39.     The Counter-Plaintiff hereby restates paragraphs 1-38 of this Complaint as if fully set forth herein.

40.     At all times that Mr. Britton and Mr. Smith promised Mr. Hershey that their "litigation strategy" was the best approach to achieving Mr. Hershey's business goals and economic objectives, these two partners of Schnader did so knowing that they intended to withhold from Mr. Hershey the resources of Schnader by not assigning a senior partner knowledgeable in private equity investments.  Mr. Britton and Mr. Smith did so willfully and intentionally and thereby caused Mr. Hershey to enter into the engagement letter dated December 14, 2011 under false pretenses.

41.     Mr. Britton and Mr. Smith caused Mr. Hershey to pursue a legal strategy with higher costs and higher risks than the one Mr. Hershey desired to pursue.  Mr. Britton and Mr. Smith did not disclose to Mr. Hershey any prospective costs by way of a budget their firm could best estimate, nor discuss with Mr. Hershey the risks associated with their designed "litigation strategy."  In so doing, Mr. Britton and Mr. Smith intentionally concealed from Mr. Hershey the "real strategy" which was to steer him into a "global settlement" that would be injurious to his business goals, his economic interests and the economic interests of his family through their membership interests in Acadia.

42.     The actions of Mr. Britton and Mr. Smith have caused economic injury and economic loss to Mr. Hershey of not less than $4,300,000 and $1,950,000 in monies subject to the "turn-over proceeding" and such further economic loss to his equity position in Acadia yet to be quantified.

## COUNT III

### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS – UNDER VIRGINIA LAW

43.     The Counter-Plaintiff hereby restates paragraphs 1-42 of this Complaint as if fully set forth herein.

44.     At all times that Schnader represented Mr. Hershey, Mr. Hershey was (and still is) a member of Acadia and enjoys all rights, duties and privileges of being an equity holder of Acadia and the mutually beneficial express and implied covenants binding upon members of limited liability companies and Acadia in particular.

45.     Acadia's Amended and Restated Operating Agreement dated February 1, 2002, contains mutually-binding contractual provisions between and among Acadia and its six (6)

other members who are family members or related trust entities compromising 100% of the ownership in Acadia.

46.     At all times, Mr. Britton and Mr. Smith had knowledge of the Acadia Operating Agreement, the pro forma Acadia balance, the Acadia member's equity position and Acadia's revenues – both actual and potential.

47.     Mr. Britton and Mr. Smith counseled a legal strategy to Mr. Hershey which intentionally interfered with Mr. Hershey's stated business goals and economic opportunities and thereby caused economic loss to Mr. Hershey of not less than $4,300,000 and of $1,950,000 in monies subject to the "turn-over proceeding" and such further economic loss to his equity position in Acadia yet to be quantified.

## COUNT IV

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS – UNDER DISTRICT OF COLUMBIA LAW

48.     The Counter-Plaintiff hereby restates paragraphs 1-47 of this Complaint as if fully set forth herein.

49.     At all times from Mr. Hershey's initial consultation with Mr. Britton at his law offices on or about December 7, 2011, Mr. Britton was informed of Mr. Hershey's Sleep Disorder diagnosis.  Mr. Hershey further informed Mr. Britton and Mr. Smith of the results of his annual physical on or about January 31, 2012, and his planned initial visit to a neurologist on or about March 6, 2012, to go through a battery of diagnostic testing (to proceed for four (4) weeks and which yielded a positive prognosis at a consultation on or about April 24, 2012).

50.     Mr. Britton and Mr. Smith engaged in a sequence of bad faith communications beginning at some time in December 2011, but not later than Monday,

December 19, 2011.  These bad faith communications were intended by Mr. Britton and

Mr. Smith to increase the  mental and emotional stress on Mr. Hershey with the express

purpose of causing Mr. Hershey great personal injury.  Said bad faith communications

including the inducements to enter into the engagement letter dated December 14, 2011

were done willfully and with the malicious purpose of causing Mr. Hershey severe

emotional distress and otherwise prevented or inhibited Mr. Hershey's ability to recover

from his Sleep Disorder and its effects more rapidly than would otherwise have been

possible for him to do.  Mr. Hershey suffered a mild heart attack on June 15, 2012, which

he recovered from satisfactorily with limited permanent damage.

51.    Mr. Hershey was injured by the willful and malicious conduct of Mr. Britton

and Mr. Smith and should be compensated for injury thereby suffered in an amount not less

than $1,500,000 for ordinary damages and not less than $4,500,000 for punitive damages.


## COUNT V

## CONSPIRACY TO INJURE ASSETS, BUSINESS INTERESTS AND TRADE SECRETS UNDER VIRGINIA LAW"

52.    The Counter-Plaintiff hereby restates paragraphs 1-51 of this Complaint as

if fully set forth herein.

53.    At the outset of the consultation with Schnader, upon the engagement of

Schnader, in the many extensive meetings with Schnader partners up to and including the

meeting in New York City on or about January 26, 2012, Mr. Hershey described in

extensive detail the long-term investment strategy embedded in the extant Acadia portfolio.

Mr. Hershey provided a detailed explanation to the Schnader partners of the slow and steady

build-up from January 1, 2000 through August 31, 2008, just shortly before the onset of the

Financial Crisis which began on or about September 15, 2008. Mr. Hershey explained, with supporting documentation, the $85 million of fundings into the Acadia portfolio and the $45 million in distributions revenue generated through November 30, 2011. Mr. Hershey described to the Schnader partners in detail, with supporting documentation, the original Plan of Reorganization, the Disclosure Statement and the Motion to authorize the assumption of investment contracts filed in the Virginia Proceeding by the original Debtor counsel, the law firm of Stinson Morrison & Hecker LLP.

54.    Mr. Hershey presented to the Schnader partners the provisions of the Acadia Operating Agreement dated February 1, 2002 describing Acadia's Business Purpose which reads as follows:

### ARTICLE III – BUSINESS PURPOSE

3.1 Purpose. The purpose of the Company is to operate and manage Company Property, as such activity may be lawfully conducted in limited liability company form. It is intended that in pursuing its Purpose, the Company will strive to generate profits and increase the wealth of its Members by seeking long-term capital appreciation through medium- and long-term investments (generally in excess of three years) and to provide investment diversification to its Members.

3.2 Authorized Activities. Subject to all other provisions of this Agreement, the Company shall be authorized to engage in any kind of lawful activity and perform and carry out contracts of any kind that are necessary or advisable in connection with the accomplishment of the Company Purpose. Without limiting the foregoing statement of the Company's Purpose, it is intended that the Company will accomplish its Purpose principally by investing in (i) debt and equity securities (including derivatives thereof) of public and private companies; (ii) venture, buy-out, hybrid, real estate, and other types of private equity funds (but not funds in which hedging strategies and/or derivative investments are the predominant investment strategy); (iii) real estate; and (iv) other forms of pooled investments including but not limited to investment companies/mutual funds.

55.    Mr. Hershey provided detailed instructions to the Schnader partners of his business and economic goals with the aim of achieving a rapid consensual agreement to

aid a new Plan of Reorganization on the timeline provided by the Order entered in the

Virginia Proceeding on November 28, 2011. (See Appendix A hereto)

56.     Thereupon, Mr. Smith and Mr. Britton embarked on an ultra vires course of

conduct which produced the proposed "Settlement and Plan Support Agreement" on or

about March 9, 2012.  (see Appendix E hereto)

57.     On or about February 10, 2012, Acadia sought a further extension of time to

June 1, 2012 to file a new Plan of Reorganization and Disclosure Statement.  Mr. Hershey

requested and instructed that Schnader file an Objection to the Motion which Mr. Smith

and Mr. Barkasy refused to do.  Thereupon, the extension of time was granted by the Court

on February 28, 2012.

58.     On or about March 16, 2012, Acadia filed a proposed Motion to authorize

the sale of certain designated assets "out of the ordinary course of business."

59.     On or about March 19, 2012, the Designated Representative caused to be

filed certain Monthly Operating Reports ("MOR") for November 2011, December 2011,

January 2012 and February 2012, and an amended April 2011 MOR with significantly

under-reported distributions receipts or receivables, thereby intentionally creating the

impression that Acadia was suffering a liquidity crisis and a shortfall in reasonably-

projectable revenues from its investment portfolio.

60.     On or about March 26, 2012, Acadia filed a Motion in the Virginia

Proceeding to establish certain bidding procedures in support of its undisclosed proposal to

seek to sell additional portfolio assets "outside the ordinary course of business."

61.     At all times both before and after March 19, 2012 and until April 3, 2012,

when Schnader threatened to resign, Mr. Hershey brought to the Schnader partners'

attention the inaccurate and misleading financial information being filed on the Docket of the Virginia Proceeding.

62.     Mr. Smith and Mr. Britton refused to bring these matters to the attention of the legal representatives of the Debtor, the Designated Representative of the Debtor or the legal representatives of Harris Bank despite Mr. Hershey's repeated requests and instructions to do so.

63.     In failing to follow Mr. Hershey's instructions and requests, Mr. Smith and Mr. Britton willfully, intentionally and with malice intended injury to Mr. Hershey's Claim against the Debtor, to his equity holder position in Acadia, to the investment strategy embedded in the Acadia portfolio and to the equity holder positions of all of Acadia's members.

64.     At all times from the surfacing of the "Settlement and Plan Support Agreement," and for sometime before but not sooner than December 6, 2011, Mr. Britton, Mr. Smith, Mr. Englander, Mr. Henry and Mr. Foley, on their own behalfs and on behalf of Harris Bank, intended to unfairly and wrongfully diminish and decrease the assets of Acadia and of Mr. Hershey and to unfairly and wrongfully diminish the income-generating actuality and potential of the assets of Acadia and of Mr. Hershey.

65.     Mr. Britton, Mr. Smith, Mr. Englander, Mr. Henry and Mr. Foley engaged in an exchange of communications under the purported protection of Rule 408 of the Federal Rules of Evidence to devise and implement a series of actions and a course of conduct designed to injure the investment strategy put in place by Mr. Hershey over an 11-year period up to and including the filing of a Voluntary Chapter 11 Petition on April 7, 2011 and thereby to injure and do harm to the equity holder position of Mr. Hershey and all of the Acadia members.

66.     In so engaging in the above actions and course of conduct, Schnader

> "did associate, agree, mutually undertake or concert
> together for the purpose of willfully and maliciously
> injuring another in his reputation, trade, business or
> profession by any means whatsoever...." See Virginia
> Code §18.2-499(A).

67.     In violating Virginia Code §18.2-499(A), Schnader is answerable for

three-fold damages, the costs of suit and reasonable fee to plaintiff's counsel under the

provisions of §18.2-500(A) of the Virginia Code.

68.     Mr. Hershey seeks to prove damages not less than $4,300,000 and

$1,950,000 and such further economic loss to his equity position in Acadia yet to be

quantified, all as caused by Schnader in violation of §18.2-499(A) and such costs and

counsel fees as are reasonable.

## COUNT VI

## ATTEMPTED CONSPIRACY TO INJURE ASSETS, BUSINESS INTERESTS AND TRADE SECRETS UNDER VIRGINIA LAW

69.     The Counter-Plaintiff hereby restates paragraph 1-68 of this Complaint as if

fully set forth herein.

70.     The actions and course of conduct o Schnader as averred herein constitute

an attempt:

> "to procure the participation, cooperation, agreement or other
> assistance of any one or more persons to enter into any
> combination, association, agreement, mutual understanding or
> concert prohibited in subsection A of this section...." See Virginia
> Code §18.2-499(B)

71.    In violating Virginia Code §18.2-499(A), Schnader is answerable for three-fold damages, the costs of suit and reasonable fee to plaintiff's counsel under the provisions of §18.2-500(A) of the Virginia Code.

72.    Mr. Hershey seeks to prove damages not less than $4,300,000 and $1,950,000 and such further economic loss to his equity position in Acadia yet to be quantified all as caused by Schnader in violation of §18.2-499(B) and such costs and counsel fees as are reasonable.

### PRAYER FOR RELIEF

WHEREFORE, Counter-Plaintiff, Loren W. Hershey, seeks and demands judgment against Counter-Defendant Schnader Harrison Segal & Lewis LLP, in the sums of $4,300,000, $1,950,000, $1,500,000, $4,500,000 and additional provable damages for losses to his equity holder position in Acadia Investments L.C. and further additional provable damages to his reputation, trade, business or professional, said proof of damages to be trebled, costs of suit, reasonable counsel fee and such other and further relief as is legal and equitable.

Dated: October 26, 2012                    Respectfully submitted,

                                           By: _____
                                           Loren W. Hershey, Pro Se
                                           1725 I Street, N.W.
                                           Suite 300
                                           Washington, D.C. 20006
                                           (202) 349-4185

## CERTIFICATE OF SERVICE

I hereby certify that on October 26,  2012, a true and correct copy of the

DEFENDANT'S ANSWER AND COUNTERCLAIMS, was sent via first class mail,

postage prepaid, to:

> Jonathan M. Stern, Esq.
> Levi E. Jones, Esq.
> Schnader Harrison Segal & Lewis LLP
> 750 Ninth Street, N.W.
> Suite 550
> Washington, D.C.  20001

Dated: _10-26-12_             By: _____
> Loren W.  Hershey
> Pro Se
> 1725 I Street, N.W.
> Suite 300
> Washington, D.C.  20006
> Telephone:  (202) 349-4185
> Facsimile:  (202) 349-4187
> lwhesq@aol.com