FILED
Received

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

2013 MAR 12  A 10: 30

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| SCHNADER HARRISON SEGAL & LEWIS LLP, <br><br> Plaintiff and Counter-Defendant <br><br> v. <br><br> LOREN W. HERSHEY, <br><br> Defendant and Counter-Plaintiff | ) <br> ) <br> ) <br> ) <br> ) <br> Civil No. 1:12-CV-00928-AJT/IDD <br> ) <br> ) <br> ) <br> ) |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO SCHNADER'S MOTION FOR
SUMMARY JUDGMENT AS A MATTER OF LAW ON ITS
COUNTS I AND II AND ON LOREN W. HERSHEY'S
COUNTERCLAIMS I, II, III, IV, V AND VI**

## I.    BACKGROUND

When the undersigned litigant Loren W. Hershey ("Mr. Hershey") approached Schnader

Harrison Segal & Lewis LLP ("Schnader") in early December 2011 to retain counsel to represent

him in a two-track negotiation with Acadia Investments L.C. ("Acadia"), then positioned to

rapidly exit a Voluntary Petition in a Chapter 11 Reorganization then pending under the

supervision of Bankruptcy Judge Robert G. Mayer, neither Mr. Hershey nor Schnader had been in

an attorney-client relationship with each other prior thereto.  As stated in Mr. Hershey's Affidavit

of March 11, 2013, attached hereto (Attachment A including certain documents as Annexes A-E)

and incorporated herein as if fully restated, Acadia was (and is) an "equity surplus" Debtor estate

with $50 million in assets seeking to negotiate one major $17.5M payment schedule with Harris

N.A. ("Harris Bank") and a series of payment sch edules with less than 15 other active creditors

with obligations ranging from $20,000 to $3.2 million (exclusive of the putative $4.3 million claim held by Mr. Hershey).

Mr. Hershey sought to put on the table in favor of Harris Bank a proposal to fund $3.5 million to the Bank over a 30-month period from his own investment resources. Mr. Hershey further sought to "surrender" or "give up" his putative claim of $4.3 million in order to provide an accelerated payment schedule for the general unsecured creditors (of less than $1.0 million) and the "insider creditors" (of less than $4.5 million) in order to facilitate the rapid exit of Acadia from the Chapter 11 proceeding as contemplated at the outset of the Voluntary Petition on April 7, 2011 to be as rapid as a 5-8 month period to get a Plan of Reorganization confirmed in an effective and expeditious manner.

In selecting Schnader to effectuate his proffered monetary support of $7.8 million in "real monetary value" into the Acadia balance sheet, Mr. Hershey sought to preserve as many of Acadia's financial investments against unnecessary sales -- whether under 11 U.S.C. §363 or unsupervised open-market sales following a rapid exit from the Chapter 11 proceeding.

By comparing Mr. Hershey's sworn statements in his Affidavit and the accompanying Annexes showing correspondence directly to Acadia Co-Managers with the Schnader version of "UNDISPUTED FACTS" presented in the Schnader Memorandum dated February 22, 2013, it should be clear that material facts are in significant disagreement as between the parties with the prevailing standard on summary judgment favoring the non-moving party ("Mr. Hershey") in both instances as Defendant to Schnader's Counts I and II and as Counter-Plaintiff seeking trial of Counts I, II, III, IV, V and VI.

Mr. Hershey asserts and will seek to prove at trial that the active players in negotiating any and all terms of a Plan of Reorganization sought to "freeze him out of the negotiations" by a

perverted and over-bearing undated document forwarded to him without his prior knowledge or participation on March 9, 2012 with the title "Settlement and Plan Support Agreement."   (See Attachment B hereto)

This unexpected asserted trickery on the part of his newly-retained counsel caused Mr. Hershey, first, to seek a vindication of his "information rights" which had theretofore been thwarted by Schnader's multiple failures to make appropriate written request under the Virginia Limited Liability Company Act or written motion pursuant to Rule 2004 – EXAMINATION under the Federal Rules of Bankruptcy Procedures permitting an "Interested Party" such as Mr. Hershey to get a Bankruptcy Court Order allowing full access to the books and records of a Debtor like Acadia.

Schnader steadfastly, continuously and actively declined to seek such access for Mr. Hershey to allow him to determine Acadia's current financial condition thereby "poisoning the well" and perverting the opportunity for him to come to a ready agreement to provide the materially-significant monetary support of $7.8 million to support the Debtor, Acadia, in a timely fashion.  When Mr. Hershey confronted Schnader counsel with their exercised subterfuges, delays and deceits, Schnader "took the offensive" and accused Mr. Hershey of breach of contract for failing to bring a set of billings current and sought to terminate forthwith the negotiations with Acadia and Harris Bank then underway which ought to have been completed in 45 days from start to finish.

But as the Engagement Letter of December 14, 2011, makes absolutely clear Mr. Hershey retained his right "that you will review and approve our monthly billings."  There were two fundamental problems that Mr. Hershey encountered:  (1)  Schnader attorneys embarked on a "winless" litigation approach to the Bank and a "winless" litigation approach to the Debtor

Acadia and admitted this during the course of the engagement; (2) Schnader attorneys steadfastly precluded Mr. Hershey from securing access to Acadia's books and records with which he previously had responsibility knowing that Mr. Hershey was intimately familiar with the "maturing values" of this $50 million blue-chip portfolio of Investment Contracts.

As Mr. Hershey's Affidavit lays out the metrics of the financial interests "in play," it is difficult not to conclude that "bad faith" was "in play" in lieu of honesty, "fair play" and cold sober analysis of the financial interests of all of the Creditor classes.

## II.    ARGUMENT

### A.    Schnader Is Not Entitled to Judgment as a Matter of Law on Its Contract Claim

As a fee for services dispute, the disagreements over the performance of the Engagement Letter are on both sides of the purported contract.  Mr. Hershey asserts that Schnader failed to perform efficiently or in a timely manner the primary purposes for which he engaged the law firm.[1]  Mr. Hershey asserts that effectively Mssrs. Britton,  Smith and Barkasy "duped him" into believing that Schnader could craft an effective negotiating strategy by initiating a confrontational litigating strategy that had little purpose other than an "arranged charade" between and among advisors positioned to extract monies from the billing opportunities presented.  "Lawyer Spin" and "Lawyer Churn" might be the headlines for this fact-finding if the case goes to trial on March 25 as currently scheduled.[2]

Thus, ironically, Mr. Hershey's legal arguments nearly perfectly mirror Schnader's cited "AUTHORITIES."

---

[1]   See Hershey Affidavit at §§5-8.

[2]   See Hershey Affidavit at §§9, 10 & 12.

There are very <u>bona fide</u> contests of genuine issues of material fact with respect to Schnader's entitlement to judgment on its contract claim. The engagement letter was purportedly a contract negotiated in good faith between Schnader and Hershey – whether Hershey did so knowingly or not is one of the contested facts to be determined at trial.  Hence whether Mr. Hershey signed  the Engagement "voluntarily" at Schnader's District of Columbia office on December 14, 2011 is also an open question.[3]

The proof of a breach of contract requires Mr. Hershey (or Schnader) to demonstrate (1) the existence of a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that obligation or duty; and (4) damages suffered by the non-breaching party. *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181 (D.C. 2009). The first element is satisfied by a showing that the parties expressed an intention to be bound by the material terms. *Jack Baker, Inc. v. Office Space Dev.*, 664 A.2d 1236, 1238 (D.C. 1995) (quoting *Georgetown Entertainment Corp. v. District of Columbia*, 496 A.2d 587, 590 (D.C. 1985)). The contract for legal services in this instance includes: the scope; the timely and appropriate performance; a review and approval by Mr. Hershey of Schnader's presented proposed billing statements.  Mr. Hershey contests, in light of Schnader's performance, that he voluntarily and knowingly signed a contract to achieve his objectives after thinking he was negotiating with Schnader in good faith but realizing later that he was not.  It is a straightforward question of fact given the "playbook" that Schnader employed.

---

[3]   Under Virginia's choice of law rules, District of Columbia law applies to Schnader's claim for breach. *See Insteel Indus. v. Costanza Contr. Co.*, 276 F. Supp. 2d 479, 483 (E.D. Va. 2003) ("It is axiomatic that, when sitting in diversity jurisdiction, federal courts must apply state substantive law as announced by the state's highest court."); *Blue Cross & Blue Shield Ass'n v. Group Hospitalization & Medical Services, Inc.*, 744 F. Supp. 700, n. 4 (E.D. Va. 1990) ("Pursuant to Virginia choice of law rules, the validity, interpretation and construction of agreements are governed by the laws of the state where the contracts were made.").

Thus, when performance terms are put in dispute because Mr. Hershey questions the effectiveness, the timing and the bona fides of best efforts given Schnader's failed achievement of plainly-stated negotiating objectives then the plain language of the payment obligations is put in question as well. The Schnader position on the timing of the asserted February 29, 2012 date to get a payment invites ought to bring this Court's attention to the issue of the failure to treat "time is of the essence" in Schnader's performance, Mr. Hershey's goal of getting a proposed Plan on the table given the promises made to the Bankruptcy Court on August 16, 2011 by Counsel for the Bank.[4]

District of Columbia law defines breach of a contract as "an unjustified failure to perform all or any part of what is promised in a contract" and that is exactly what Mr. Hershey will demonstrate at trial: the failure of Schnader to perform in good faith its end of the bargain. *Fowler v. A & A Company*, 262 A.2d 344 (D.C. 1970). Mr. Hershey will demonstrate by the testimony of the lawyer-negotiators fully the "stakes" they controlled including the motivation of "self-dealing."[5]

Thus, damages for breach of contract might otherwise be measured by considering what benefit "may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract." *Fowler v. A & A Company*, 262 A.2d 344 (D.C. 1970) (quoting *Hadley v. Baxendale*, 9 Exch. 341 (1854)). Here, Mr. Hershey has described Schnader's failure to achieve the "benefits" he sought for the "benefit" of the creditor Harris Bank, for the "benefit" of this Debtor in a Chapter 11 Reorganization and the consequent "benefit" to the Acadia equity-

---

[4] See Annex C to the Hershey Affidavit, which presents Bank counsel's promise to assure a Plan of Reorganization in six months or by February 2012.

[5] See Annex E to the Hershey Affidavit demonstrating the substantial amount of Administrative Costs run up by Debtor professionals.

holders.

Schnader's billings presented to Hershey were viewed by him as unreasonable at the very time they were presented, given the failure to conduct "transparently routine negotiations" between and among skilled bankruptcy practitioners such as Mssrs. Barkasy and Smith with skilled counter-party bankruptcy practitioners like Douglas M. Foley of McGuire Woods LLP and Bradford F. Englander of Whiteford Taylor Preston LLP.

Hence, Mr. Hershey's assertion that Schnader's asserted "fees" entitlement did not meet the standard of reasonableness under the Rule 1.5(a) standard of the District of Columbia Rules of Professional Conduct.[6]

For the foregoing counter-statement of factually-based reasons, Mr. Hershey vigorously asserts that Schnader is not entitled to summary judgment on its breach of contract claim. Accordingly, Mr. Hershey asserts that Schnader's argument that Rule 8 of the Federal Rules of Civil Procedure which establishes the general rules of pleading fails. The Schnader argument is that, "[i]n responding to a pleading that Mr. Hershey failed to deny certain allegations that "he engaged Schnader to represent certain of his interests" and somehow contains characterizations that were "inaccurate and incomplete" is fatuous in light of the actual course of events demonstrated in and through the Hershey Affidavit. These will be presented and argued to the Court.

### B.   Schnader Is Not Entitled to Judgment as a Matter of Law on Mr. Hershey's Fiduciary Duty Claim

Here again Mr. Hershey concurs in Schnader's statement on "AUTHORITIES."

---

[6]   See Rule 1.5(a) of the District of Columbia Rules of Professional Conduct.

Indeed, in order to establish a claim under District of Columbia law for breach of fiduciary duty, the claimant must prove that: "(1) defendant owed plaintiff a fiduciary duty; (2) defendant breached that duty; and (3) to the extent plaintiff seeks compensatory damages—the breach proximately caused an injury." *Bode & Grenier, L.L.P. v. Knight*, 821 F. Supp. 2d 57, 64 (D.D.C. 2011) (quoting *Paul v. Judicial Watch, Inc.*, 543 F. Supp. 2d 1, 5-6 (D.D.C. 2008)).

Thankfully, and with <u>de rigeur</u> Schnader acknowledges that it owed Hershey a fiduciary duty during the course of its representation of him. Not surprisingly, Schnader denies any breach. Mr. Hershey now amplifies through his Affidavit his pleading position of Schnader's "threat to withdraw it services and then its actual withdrawal of its services in precipitous fashion ...." Counterclaim, at ¶ 37. Mr. Hershey, through the intended testimony at trial of Schnader attorneys and other bankruptcy practitioners, will demonstrate that skillful attorneys attendant to negotiating requirements in a Chapter 11 Reorganization setting – whether or not as experts offering testimony under Rules 702, 703, or 705 of the Federal Rules of Evidence – regularly achieve "high-dollar" "slam-dunk" timely settlements and that failure to do so in a context like the Acadia situation could only constitute a breach of fiduciary duty. Withdrawal of representation by Schnader is one thing; "bad faith" representation by Schnader is another. The damages to be proven are measurable and demonstrable.

Mr. Hershey's Affidavit does tie Schnader's termination of services to his claimed damages. Mr. Hershey will demonstrate losses to be not less than $4,300,000 and, in addition, losses of $1,950,000 in monies subject to the 'turn-over proceeding' designed to be applied to a Plan of Reorganization. There are such further economic loss to his equity position in Acadia yet to be quantified," Counterclaim, at ¶ 38, but will be quantified at trial.

Schnader may claim mitigation or may claim lack of causation. But that will require proof at trial.[7]  Mr. Hershey and Schnader will adduce evidence on both sides of this proposition.

Fortunately, Schnader admits that it could not ever achieve Mr. Hershey's objective through litigation in the New York garnishment proceeding. Schnader concedes: "As for the efforts to collect that judgment debt in New York, there can be no dispute that Schnader succeeded in delaying garnishment of the money, which otherwise would have been turned over to the judgment creditor in December 2011." (Schnader Memorandum at p. 20)  Mr. Hershey was not looking for "delay," he sought a negotiated compromise to achieve "win-win goals" promptly.

Schnader, fortunately, also concedes its failure to achieve Mr. Hershey's stated objective to further the interests of the equity holders of Acadia (Memorandum at pp. 20-21).

> To the extent Hershey seeks to assert any claim for injury to
> Acadia's position, he lacks standing to pursue such a claim. Acadia
> is a Virginia limited liability company. "Like a corporation, a
> limited liability company is a legal entity entirely separate and
> distinct from the shareholders or members who compose it."
> *Mission Residential, LLC v. Triple Net Props., LLC*, 275 Va. 157,
> 161, 654 S.E.2d 888, 891 (2008). The action Hershey purports to
> bring for damage to Acadia may be brought by Acadia itself or
> through a derivative action. *Simmons v. Miller,* 261 Va. 561, 573,
> 576, 544 S.E.2d 666, 674–75 (2001) (noting that "[t]he
> overwhelming majority rule is that an action for injuries to a
> corporation cannot be maintained by a shareholder on an

---

[7]  Schnader deftly argues at length factual matters and causation issues to be otherwise demonstrated and proven at trial with transactional witnesses. For example, Schnader argues at page 19-20: "First, he has offered no proof that he held a valid claim for $4,300,000. Second, the deadline for filing proofs of claim passed on August 10, 2011, four months before he retained Schnader. Third, he had a subsequent opportunity to assert his claim and chose not do so. When Hershey managed the Debtor early in the bankruptcy, he scheduled a claim in his name for $3,900,000 (which he signed under penalty of perjury). His claim remained scheduled as liquidated and undisputed when Schnader ended its representation. Thereafter, Acadia rescheduled the claim as unliquidated and disputed.[7] Hershey took no steps at that time to reassert his claim. Fourth, Hershey intended to waive his claim against Acadia in order to effectuate a wealth transfer to his family members, the owners of Acadia." (Schnader Memorandum at 19-20)

individual basis and must be brought derivatively").

Mr. Hershey agrees with the legal description which then only adds weight to the logic of the alignment of interest so plainly presented in the Acadia matrix of interests (See Hershey Affidavit at ¶9) and well understood by every bankruptcy practitioner.

### C.   Schnader Is Not Entitled to Judgment as a Matter of Law on Mr. Hershey's Fraudulent Inducement Claim

Mr. Hershey's claim for fraudulent inducement asserts that John Britton and Eric Smith promised their approach to achieving his goals was the best approach, all the while "knowing that they intended to withhold from Mr. Hershey the resources of Schnader by not assigning a senior partner knowledgeable in private equity investments."[8]  Mr. Hershey rightfully then complains that the legal strategy suggested by Schnader had "higher costs and higher risks than the one [he] desired to pursue" and that Schnader did not provide him with a budget or discuss the risks of their strategy.[9]  Mr. Hershey asserts by his Affidavit that Schnader did no more than "set a trap" through their demonstrable and devious course of conduct.

This claim is at the heart of the matter:  Schnader professionals knew better!  The law is straight-forward. The elements of fraudulent inducement to enter into a contract under District of Columbia law are: "(1) a false representation (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation." *Hercules & Co. v. Shama Restaurant*, 613 A.2d 916 (D.C. 1992).  Mr. Hershey will demonstrate at trial, but has demonstrated through his averments and his Affidavit the manner of staffing and under-staffing a negotiating strategy requiring expertise in the assets to

---

[8]   Counterclaim, at ¶ 40.

[9]   Counterclaim, at ¶ 41.

be negotiated about. Again, Schnader's denials prove the point as they are highly skillful attorneys otherwise and completely adroit at identifying the necessary expertise in seasoned partners.[10]

Mr. Hershey entered into the contract with certain expectations well-stated and with the hearing of testimonial evidence this Court will find that Schnader's attorneys used excessive guile, readily demonstrable, thereby committing fraud in the inducement in persuading Mr. Hershey to retain its service. District of Columbia law will not obstruct such an examination. *See, e.g., Hercules & Co. v. Shama Restaurant,* 613 A.2d 916 (D.C. 1992) ("As we held in *1010 Potomac Assocs., supra*, 485 A.2d at 210, the purpose of the parol evidence rule 'is to promote the stability of transactions by preventing disgruntled parties from avoiding obligations by alleging oral understandings that conflict with their written agreements when those agreements were reduced to writing in order to forestall just such contentions."); *St. James Mut. Homes v. Andrade*, 951 A.2d 766, 770 (D.C. 2008) (explaining that parol evidence can never be used to contradict the terms of a written contract). Parole evidence is not the issue here. Schnader's performance in purporting to negotiate on Mr. Hershey's behalf is.

### D.    Schnader Is Not Entitled to Judgment as a Matter of Law on Mr. Hershey's Tortious Interference Claim

Mr. Hershey asserts in his third count that Schnader tortiously (if not devilishly) interfered

---

[10] Schnader asserts in its Memorandum that it could "carve up" Mr. Hershey's interests, semantically speaking, in any way possible at page 21: "The scope of the engagement was one that called for lawyers skilled in litigation and bankruptcy, and that is exactly what he got. That his engagement was not staffed by a lawyer especially knowledgeable about private equity is irrelevant. Indeed, such a lawyer probably could not have achieved the excellent results achieved by the team assembled by John Britton. Had there been a subsequent mutual agreement to extend the scope of the representation to "a possible 'white knight' financial transaction and other asset protection and wealth management matters," perhaps private equity experience would have been appropriate, but there never was any such agreement." (Memorandum at 21).

with contractual relations.  The elements of tortious interference with contractual relations under

Virginia law are properly stated as:  "(1) A contract expectancy; (2) Defendant knew of the

expectancy; (3) Defendant intentionally interfered with the expectancy; (4) Defendant used

improper means or methods to interfere with the expectancy; and (5) Plaintiff suffered a loss as a

result of Defendant's disruption of the contract expectancy."  *Preferred Sys. Solutions, Inc. v. GP*

*Consulting, LLC*, 284 Va. 382, 732 S.E.2d 676 (2012) (citing *Maximus, Inc. v. Lockheed Info.*

*Mgmt. Sys. Co.*, 254 Va. 408, 413, 493 S.E.2d 375, 378 (1997), rev'd on other grounds, 259 Va.

92, 524 S.E.2d 420 (Va. 2000)).

The entirety of the course of conduct of Schnader to ignore Mr. Hershey's clear requests

to memorialize key negotiating positions, to seek access to Acadia books and records and to

engage in serious and effective negotiations with the Debtor and with the Bank evince the highest

level of disregard for the economic interests of all stakeholders not just Mr. Hershey's.  This

Court may make a determination that Schnader's conduct crossed the line from mere inadvertence

to negligence or even to a form of "malicious intent."  But all that is required is demonstrating

that the service-provider here, the Schnader attorneys staffing the negotiation, had no other intent

then to "freeze" Mr. Hershey out of the proposed Plan of Reorganization.  The very performance

of Schnader's attorneys interfered with pursuit of the legitimate Acadia business purpose stated in

the Amended and Restated Operating Agreement:

## ARTICLE III – BUSINESS PURPOSE

> 3.1 Purpose.  The purpose of the Company is to operate and
> manage Company Property, as such activity may be lawfully conducted
> in limited liability company form.  It is intended that in pursuing its
> Purpose, the Company will strive to generate profits and increase the
> wealth of its Members by seeking long-term capital appreciation
> through medium- and long-term investments (generally in excess of
> three years) and to provide investment diversification to its Members.

3.2 <u>Authorized Activities</u>. Subject to all other provisions of this Agreement, the Company shall be authorized to engage in any kind of lawful activity and perform and carry out contracts of any kind that are necessary or advisable in connection with the accomplishment of the Company Purpose. Without limiting the foregoing statement of the Company's Purpose, it is intended that the Company will accomplish its Purpose principally by investing in (i) debt and equity securities (including derivatives thereof) of public and private companies; (ii) venture, buy-out, hybrid, real estate, and other types of private equity funds (but not funds in which hedging strategies and/or derivative investments are the predominant investment strategy); (iii) real estate; and (iv) other forms of pooled investments including but not limited to investment companies/mutual funds.

**E.    Schnader Is Not Entitled to Judgment as a Matter of Law on Mr. Hershey's Intentional Infliction Claim**

In Count IV of his Counterclaims, Mr. Hershey asserts that Schnader attorneys' "bad faith communications" were made willfully and maliciously for the purpose of causing him severe emotional distress. (See Hershey Affidavit at ¶23). The evidence of any outrageous conduct on the part of Schnader attorneys or any severe emotional distress will become more clear from the testimony of the timing of what Mr. Hershey's medical supervision required and how Schnader set up its timetables for the negotiation to succeed or fail. The key transactional dates are: January 20 (agreement between Acadia and the Bank targeted by Court Order), January 24 (forward of Mr. Hershey's negotiating terms), January 25 (the hearing in New York City), January 31 (Mr. Hershey's target for a first draft of a settlement agreement), February 22 (Mr. Hershey's letter to Co-Managers to "cooperate with a Plan of Reorganization"), February 27 (Mr. Hershey's descriptive letter to Co-Manager's spelling out "real dollars"), March 9 (the perverse proposed draft Settlement and Plan Support Agreement), March 16 (Motion to Sell Assets), March 19 (belated filing of misleading Monthly Operating Reports), March 22 (Debtor counsel ultimatum to Mr. Hershey's counsel), March 29 (Mr. Hershey critique of the "costs to Acadia"

memorandum to his counsel), and April 2 (Schnader precipitous threat to withdraw) – all these the "moves" of Schnader and the Debtor's counsel suggest, and Mr. Hershey will seek to prove, a personal animus designed to harm Acadia and to do him intentional emotional harm.

Indeed, the District of Columbia law, on which Mr. Hershey relies for this count, defines the required elements of a claim for intentional infliction of emotional distress as follows: (1) "extreme or outrageous conduct" which (2) "intentionally or recklessly" causes (3) "severe emotional distress to another." *Joyner v. Sibley Mem. Hosp.*, 826 A.2d 362, 373 (D.C. 2003) (quoting *Kerrigan v. Britches of Georgetowne,* 705 A.2d 624, 628 (D.C. 1997)). "To establish the required degree of 'outrageousness,' the plaintiff must allege conduct 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.*

Mr. Hershey can describe the "sequence of contrivances" that meet the first required element, that the alleged tortfeasor committed "extreme or outrageous conduct." This requires proof of something more than mere rudeness or disrespect. "In general, a case of intentional infliction of emotional distress is made out only if the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim 'Outrageous!'" *Harvey v. Mohammed*, 841 F. Supp. 2d 164, 184 (D.D.C. 2012) (quoting *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998)) (internal quotation marks omitted).

District of Columbia courts – which this Court will look to -- rarely find cases of sufficient outrageousness to meet this high standard. Even allegations of a defendant engaging in a campaign to prevent others from doing business with the plaintiff because of race, or of an employer making obscene and offensive statements to an employee have failed to satisfy the

outrageousness standard required for intentional infliction of emotional distress. *See, e.g., Cuneo Law Group, P.C. v. Joseph*, 669 F. Supp. 2d 99, 121-22 (D.D.C. 2009) (collecting cases), *aff'd*, 428 Fed. Appx. 6, 2011 U.S. App. LEXIS 12498 (D.C. Cir. 2011); *Pitt v. District of Columbia*, 491 F.3d 494, 506, 377 U.S. App. D.C. 103 (2007).  Here, however, the upholding of a finding of intentional infliction of emotional distress where there was evidence that law enforcement officers tampered with evidence to implicate the plaintiff may  be usefully analogous to the "tampering" with the <u>bona fide</u> interests of the equity-holders of Acadia,  including Mr. Hershey, in the "freeze out" game played complicity and actively with, by and through his purported "trusted counsel" at Schnader with the other lawyer-negotiators responsible to conduct, otherwise, an efficient and effective Chapter 11 proceeding.

Indeed, Mr. Hershey will demonstrate that the allegedly outrageous conduct caused him to suffer "emotional upset of so acute a nature that harmful physical consequences might be likely to result."  The case notes that mere "mental anguish and stress do not rise to the level of severity required by the case law." *Ross v. Dyncorp*, 362 F. Supp. 2d 344 (D.D.C. 2005) (citing and quoting *Futrell v. Dep't of Labor Fed. Credit Union*, 816 A.2d 793, 808 (D.C. 2003); *Sere v. Group Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C. 1982); *Clark v. Associated Retail Credit Men*, 105 F.2d 62, 65, 70 App. D.C. 183 (1939)) (internal quotation marks omitted). Liability attaches only if a plaintiff's emotional injury is "serious" and "verifiable." *Hudson v. District of Columbia,* 558 F.3d 526, 533 (D.C.Cir. 2009).  The transactional testimony of Mr. Hershey and Mr. Hershey's physicians, Drs. Merlino and Cochran, will provide ample evidence of the timing and effects of the asserted emotional injury.  It will be for this Court to determine if the proof is sufficient as offered as live sworn testimony.

Thus, the evidence to support his claim is, on the one hand, that John Britton and Eric

Smith knew of Mr. Hershey's health issues but "engaged in a sequence bad faith communications" intended to increase his mental stress and cause him personal injury. Counterclaim, at ¶ 50. Indeed, as Schnader itself points out, Mr. Hershey alleges that these bad faith communications began no later than December 19, 2011, and that they included "the inducements to enter into the engagement letter dated December 14 ...." *Id.* Mr. Hershey does further allege that he "suffered a mild heart attack on June 15, 2012," and that he does not, in fact, allege a cause and effect connection between the acts of Messrs. Britton and Smith and the referenced heart attack. *Id.* Mr. Hershey's medical conditions, described in his Affidavit at ¶23, respectfully does not discuss the heart attack. Evidentiary material about this will be through the testimony of Drs. Merlino and Cochran, who will also address the effects of extreme stress in specific terms applied to Mr. Hershey.

"Evidence of any conduct on the part of any Schnader attorney that could reasonably be considered outrageous" will be for the finder-of-fact: this Court in a bench trial. The same findings will be asked as to "bad faith communications" and the "ill effects" resulting from the alleged outrageous conduct by Schnader.

Having shown that there are significant open issues on the material facts regarding Mr. Hershey's claim for intentional infliction of emotional distress, Mr. Hershey argues that Schnader is not entitled to summary judgment in its favor but rather to be put to the test to present its defenses establishing the lack of malice by its attorneys through their concerted conduct.

F.   **Schnader Is Not Entitled to Judgment as a Matter of Law on Mr. Hershey's Conspiracy Act Claim**

Here again, Schnader appropriately state the elements of a claim for conspiracy to injure assets, business interests, and trade secrets under Virginia law, as presented in Count V of the

Counterclaims.

Schnader quite properly recited that to establish a civil violation of the Virginia Conspiracy Act, a plaintiff must prove by clear and convincing evidence (*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 108 F.3d 522 (4th Cir. 1997); *Shirvinski v. United States Coast Guard,* No. 1:09-cv-896 (AJT/TRJ), 2010 U.S. Dist. LEXIS 113629, at *15 (E.D. Va. Oct. 25, 2010), *aff'd,* 673 F.3d 308 (4th Cir. 2012); *Tazewell Oil Co. v. United Virginia Bank/Crestar Bank*, 243 Va. 94, 413 S.E.2d 611, 619 (1992)) that a defendant: (1) combined or concerted together with another (2) with legal malice (3) causing injury to the plaintiff's reputation, trade, business or profession. Va. Code Ann. § 18.2-499, 500 (2009); *Virginia Vermiculite v. W.R. Grace & Co.— Conn.*, 144 F. Supp. 2d 558, 601 (W.D. Va. 2001) (citing *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 108 F.3d 522, 526 (4th Cir. 1997); *Simmons v. Miller,* 261 Va. 561, 544 S.E.2d 666, 676-77 (Va. 2001); *Allen Realty Corp. v. Holbert*, 227 Va. 441, 318 S.E.2d 592, 596 (1984)).

The factual basis for Mr. Hershey's claim of "combined or concerted action" to injure assets is as plain as day. For whatever set of human devices, from the meeting between and among the representatives of Mr. Hershey and the representatives of the Debtor on January 18, 2012 in Falls Church, Virginia, Schnader could only act in concerted fashion by and through as the sequence of material events noted above beginning January 24, 2012 and continuing through early April 2012 demonstrate.

No Schnader attorney nor any attorney for Harris Bank or for Acadia would have produced demonstrable direct evidence of wrongful conduct. The demonstration of a "combination" or "concerted action" to injure Mr. Hershey's interests and the interests of Acadia

17

is the determination by the finder-of-fact from the obvious negative effects of the actual course of conduct.  The evidence of concerted action is a "freeze-out agreement" not only proffered in bad faith but done so in a manner to maximize harm to not only Mr. Hershey's interests but that of the Debtor's.  Summary Judgment is not proper on this prima faciae showing.

### G.     Schnader Is Not Entitled to Judgment as a Matter of Law on Mr. Hershey's Attempted Conspiracy Claim

Again, Schnader astutely presents the law of Count VI of the Counterclaim which asserts a cause of action for an attempt to conspire against his business interests under Va. Code § 18.2-499(B).

The Fourth Circuit and the Supreme Court of Virginia have held that civil relief is available for an attempted conspiracy under the statute.  *See Multi-Channel TV Cable Co.,* 108 F.3d at 527; *Greenspan v. Osheroff*, 232 Va. 388, 351 S.E.2d 28 (1986). The essence of these holdings is that the statute may be used civilly against attempts to procure a conspiracy where damage in fact is done to the plaintiff.

The evidence discussed above of an actual "combination" or "concerted action" to injure Mr. Hershey's assets is equally applicable to this Count.  Schnader's attorneys were absolutely essential parties to procure the participation, cooperation, agreement or other assistance of any one or more persons" to enter the attempted concert of action to injure the assets of Mr. Hershey. The testimonial record at trial will be replete with a sequence of events from at least January 18, 2012 which will be supportive of this additional grounds for demonstrating the alleged intended injury.

As in Count V of the counterclaims, Mr. Hershey has identified damages of $4,300,000,

which are related to his claims against Acadia, and $1,950,000, which are related to the attempt to pay good monies into the Acadia Plan.   An alleged damages resulted from an alleged conspiracy on Schnader's part on the part of the other "player" participants will be proven with sufficient evidence to meet a "clear and convincing" standard of proof as required by Virginia law.

**Conclusion**

The litigant Mr. Hershey respectfully requests that this Court should carefully evaluate the averments, the Affidavit and the attached documentation in the light most favorable to the non-moving party and rule against Schnader on each request for summary judgment and permit the litigation to proceed to trial on March 25 at 10:00 a.m. as currently scheduled.

Dated:   March 11, 2013                          Respectfully submitted,

Loren W. Hershey, Pro Se
1725 I Street, N.W., Suite 300
Washington, D.C.  20006
Phone:  (202) 349-4185
Fax:  (202) 349-4187
lwhesq@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2013, I completed the attached Memorandum of Points And Authorities in Opposition To Schnader's Motion For Summary Judgment As A Matter Of Law On Its Counts I And II And On Loren W. Hershey's Counterclaims I, II, III, IV, V And VI and the Supporting Affidavit of Mr. Hershey with Certain Documents Attached.  This Memorandum and all of its attachments will be promptly filed with the Clerk of Court with a Motion for Leave to File the Response in Opposition one day late on March 12, 2013.

Notwithstanding, I also hereby certify that on March 11, 2013, I sent by email a true copy of the Memorandum Of Points And Authorities and attachments in full to counsel for the Plaintiff and Counter-Defendant and also sent a copy by U.S. Mail, first class postage prepaid to Counsel:

> Jonathan M. Stern, Esq. (jstern@schnader.com)
> Levi E. Jones, Esq. (ljones@schnader.com)
> Schnader Harrison Segal & Lewis LLP
> 750 Ninth Street, N.W.
> Suite 550
> Washington, D.C.  20001

Dated:  3 - 11 - 13          By: _____

> Loren W.  Hershey
> Pro Se
> 1725 I Street, N.W.
> Suite 300
> Washington, D.C.  20006
> Telephone:  (202) 349-4185
> Facsimile:  (202) 349-4187
> lwhesq@aol.com